## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**JAMES BREITENBACH,**

    *Plaintiff,*

    v.

**SAGESTREAM, LLC,**

    *Defendant.*

**Case No. 2:24-cv-00893-JDW**

## <u>MEMORANDUM</u>

When James Breitenbach applied for credit, SageStream, LLC reported to a potential credit issuer that Mr. Breitenbach was dead. Unlike Bernie Lomax and Generalissimo Francisco Franco, he wasn't.[1] He wasn't even "mostly dead."[2] SageStream claims that its mistake in reporting Mr. Breitenbach as deceased was reasonable, and it has some evidence to support its position. But Mr. Breitenbach also has evidence to suggest that SageStream didn't do enough to verify the information before it reported his death. This record creates questions of fact as to whether SageStream negligently or willfully violated its reporting obligations under the Fair Credit Reporting Act. Therefore, I cannot grant summary judgment in favor of either Party.

---

[1] *See Weekend at Bernie's* (20th Century Fox 1989); *Saturday Night Live*, Season 1: Episode 7 (NBC television broadcast, aired Dec. 13, 1975) (Weekend Update segment).

[2] *The Princess Bride* (Act III Communications 1987).

## I.    RELEVANT BACKGROUND

### A.    Factual History

SageStream offers its Credit Optics products to companies that decide whether to offer credit to customers. In response to a query, Credit Optics returns three-digit scores to assess different types of credit risk, ranging from 001-999. A reason code accompanies each score that identifies the reasons behind the score. In some cases, "Credit Optics may return a score value of 000, which is not a score, but rather an indicator that SageStream is precluded from communicating a score." (ECF No. 58-4 at 6.) SageStream refers to this as an "exception score." (ECF No. 58-3 at ¶ 7.) The Credit Optics reference manual identifies six scenarios that could result in SageStream communicating an exception score. Credit Optics will communicate a 000 exception score when "[t]he consumer is reported as deceased based on data published by the Social Security Administration or provided by other sources." (ECF No. 58-4 at 6.) SageStream calls this as an "exception condition." (ECF No. 58-3 at ¶ 7.) Credit Optics provides different codes to explain the reason behind an exception condition. For example, Credit Optics returns a 232 code "when the input Social Security number provided to SageStream matches a Social Security number on the Social Security Administration's Death Master File." (ECF No. 58-2 at ¶ 10.) When an input SSN matches a SSN listed on the Death Master File, that could indicate a risk of fraud.

On February 28, 2023, Mr. Breitenbach was shopping for a mattress at Mattress Warehouse. He sought to open a credit card with Synchrony Bank to take advantage of a

0% interest credit card offer. Synchrony requested two credit risk scores from SageStream. Synchrony provided Mr. Breitenbach's first name, last name, address, date of birth, and Social Security Number to SageStream. Mr. Breitenbach's SSN starts with 164. However, when Synchrony provided the SSN to SageStream, a typo led Synchrony to give SageStream an otherwise-identical SSN that started with 162.[3] The SSN starting with 162 belongs to an individual named Mark H. Fandl. According to the SSA's Death Master File ("DMF"), Mr. Fandl is deceased. In addition, the SSA death record for Mr. Fandl revealed that aside from having a different name than Mr. Breitenbach, he also has a different date of birth and resided in a different zip code.

In response to Synchrony's credit request, SageStream's Credit Optics products returned an exception score of 000. It also provided a corresponding exception code of 232 (the "Exception Code"). SageStream did not tell Synchrony that the SSN that appeared on the DMF belonged to Mr. Fandl rather than Mr. Breitenbach. Synchrony viewed the Exception Code as a high risk of fraud and denied Mr. Breitenbach's credit application.

On March 4, 2023, Synchrony sent a letter to Mr. Breitenbach, advising as follows:

We have received your request for a credit product with MATTRESS WAREHOUSE issued by Synchrony Bank. Unfortunately, we are unable to approve your request at this time.

Your request was denied for the following reason(s):

Credit bureau reports applicant is deceased

---

[3]    Neither Party knows what led to this typographical error, but there is no dispute that Synchrony provided the wrong SSN to SageStream.

(ECF No. 58-19 at 1.) During this litigation, Synchrony provided a declaration explaining that it "interpreted the '232' reason code to mean that the input Social Security number provided on the Credit Application was associated with a deceased record." (ECF No. 58-9 at ¶ 7.)

### B.    Procedural History

On February 29, 2024, Mr. Breitenbach sued SageStream, alleging that SageStream is liable for both negligent and willful violation of Section 1681e(b) of the Fair Credit Reporting Act. The Parties arbitrated their dispute as part of the Court's mandatory arbitration program, and the arbitration panel entered an award on January 28, 2025. Mr. Breitenbach requested a trial *de novo*, and the Parties filed cross-motions for summary judgment. Both motions are ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

In opposing summary judgment, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings" and "must do more than simply show that

4

there is some metaphysical doubt as to the material facts." *Id.* (quotation omitted). "[I]nstead, [s]he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B). If she fails to make this showing, then the Court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3).

The filing of cross-motions for summary judgment does not change the applicable standard. *See Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). Rather, when faced with cross-motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (quotation omitted).

## III.    ANALYSIS

The FCRA is a remedial statute designed to "protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quotation omitted). It mandates that whenever a consumer reporting agency ("CRA") like

SageStream "prepares a consumer report[,] it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Consumers may assert claims for both negligent and willful violations of the statute.

To establish a negligent violation of the FCRA, a plaintiff must prove that: "(1) inaccurate information was included in a consumer's ... report; (2) the inaccuracy was due to defendant's failure to follow reasonable procedures to assure maximum possible accuracy; (3) the consumer suffered injury; and (4) the consumer's injury was caused by the inclusion of the inaccurate entry." *Bibbs v. Trans Union LLC*, 43 F.4th 331, 342 (3d Cir. 2022) (quotation omitted). To establish a willful violation, the plaintiff must make an "additional showing that the defendant acted knowingly or with reckless disregard of the statute's terms." *Id.* at 343 n.16 (citing *Seamans v. Temple Univ.*, 744 F.3d 853, 868 (3d Cir. 2014)). In this case, Mr. Breitenbach has enough evidence to present both of his claims to a jury.

A. **Consumer Report**

The FCRA's maximum accuracy requirement applies to consumer reports. Under the statute, a "consumer report" is "*any* written, oral, or other communication of *any* information by a [CRA] bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving

as a factor in establishing the consumer's eligibility for … credit or insurance to be used primarily for personal, family, or household purposes[.]" 15 U.S.C. § 1681a(d)(1)(A) (emphasis added). Given "the breadth of the language that Congress used in drafting that statute" and the Third Circuit's guidance that "any interpretation of [the FCRA] must reflect" consumer-oriented objectives, *Cortez*, 617 F.3d at 706, 707, I have little trouble concluding that the Exception Code that SageStream provided to Synchrony is a consumer report under the FCRA.

The Exception Code indicates that the input SSN that Synchrony provided for Mr. Breitenbach matches a SSN on the SSA's DMF, suggesting—albeit mistakenly—that Mr. Breitenbach was deceased or was attempting to obtain credit using someone else's information. As such, the Exception Code necessarily communicates information that bears on Mr. Breitenbach's credit worthiness, credit capacity, and personal characteristics—making it a consumer report.

To conclude that the Exception Code is not subject to the FCRA, I "would have to conclude that Congress did not mean what it said when it unequivocally defined 'consumer report' to include '*any* … communication of *any* information by a consumer reporting agency.'" *Cortez*, 617 F.3d at 707 (quotation omitted) (emphasis added). I will not do that. Instead, reading the FCRA "in a liberal manner in order to effectuate the congressional intent underlying it," *id.* at 722, I conclude that the Exception Code falls within the statute's broad definition of a consumer report. That the Exception Code might

bear on a risk of potential identity theft or fraud in addition to Mr. Breitenbach's eligibility for credit does not render the FCRA inapplicable.

**B.    Inaccuracy**

A jury could also conclude that the Exception Code was inaccurate. "[F]actually incorrect information is 'inaccurate' for purposes of FCRA." *Seamans*, 744 F.3d at 865. In addition, "even if the information in a [consumer] report 'is technically correct, it may nonetheless be inaccurate if, through omission, it creates a materially misleading impression.'" *Bibbs*, 43 F.4th at 343 (quotation omitted). At a minimum, Mr. Breitenbach can establish that the Exception Code was inaccurate because it created the materially misleading impression that Mr. Breitenbach was dead or that he was attempting to apply for credit using someone else's identity.

To determine whether the Exception Code was misleading, I must apply an objective standard and "determine[] how a reasonable reader would have comprehended [it]." *Bibbs*, 43 F.4th at 342. There is no dispute that SageStream's Credit Optics product returns a 232 code "when the input Social Security number provided to SageStream matches a Social Security number on the Social Security Administration's Death Master File" and that SageStream returned this Exception Code to Synchrony. (ECF No. 58-2 at ¶ 10.) However, a jury could conclude that the Exception Code is misleading in light of SageStream's own explanations about what the 232 code means.

Throughout the Credit Optics reference manual, SageStream explains that it may return a 232 exception condition when "***[t]he consumer*** is reported as deceased based on data published by the Social Security Administration or provided by other sources." (ECF No. 58-4 at 6, 15 (emphasis added).) And the corresponding description for the 232 code is listed as: "***Consumer*** reported as deceased." (*Id.* at 16 (emphasis added).) The reference manual does not define "consumer," but a reasonable reader would interpret "consumer" to refer to the person for whom SageStream's client has requested a credit score. Indeed, the manual explains that lenders and service providers use the Credit Optics product "to evaluate consumers for FCRA regulated decisions." (*Id.* at 5.) Given all this, a jury could conclude that a reasonable reader would have interpreted the Exception Code to mean that the consumer—*i.e.,* Mr. Breitenbach—was listed as deceased. There is no question that is materially misleading information, as Mr. Breitenbach is very much alive.

Even if a jury adopts SageStream's version of what the Exception Code conveys, it could still conclude that it was misleading. For example, a reasonable reader could have interpreted the code to suggest that Mr. Breitenbach was trying to use the SSN of a deceased individual.[4] Reporting a deceased notation out of concern for potential fraud "could well suggest to a reasonable user of the report that the applicant might be untrustworthy, such that reporting the notation when the applicant is not actually

---

[4]      While the Parties cannot pinpoint the source of the SSN error, there is no dispute that Mr. Breitenbach was not trying to obtain credit by using Mr. Fandl's information.

deceased would be misleading and thus inaccurate within the meaning of the FCRA, even if the reporting is technically accurate." *Young v. Experian Info. Sols., Inc.*, No. 22-cv-50222, --- F.Supp.3d ---, 2025 WL 964877, at *10 (N.D. Ill. Mar. 31, 2025). That describes this case.

The *Mijne* case on which SageStream relies does little to assist it. In that case, in addition to reporting that the input SSN belonged to a deceased person, the CRA's credit report went further and "noted there was a high probability that the Transmitted Social Security Number belonged to another person. In other words, the report suggested only that the application contained the wrong social security number and [the lender] may wish to investigate the applicant further." *Mijne v. Experian Info. Sols., Inc.*, No. 23-cv-22694, 2024 WL 1655475, at *6 (S.D. Fla. Apr. 17, 2024). SageStream did not include similar, clarifying information along with the Exception Code. Absent such information, a jury could conclude that the Exception Code was materially misleading.

However, while Mr. Breitenbach can establish that the Exception Code was inaccurate, SageStream has offered evidence that a reasonable reader could have interpreted the code to mean simply that "the input Social Security number provided on the Credit Application was associated with a deceased record." (ECF No. 58-9 at ¶ 7.) Synchrony even provided a declaration that it interpreted the Exception Code that way, and the sham affidavit rule does not apply.

That rule permits "a court to disregard a later statement by a deponent on two conditions: the later statement contradicts the witness's deposition testimony, and the

discrepancy between the two statements is neither supported by record evidence nor otherwise satisfactorily explained." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 209 (3d Cir. 2022). But there is no indication that the declarant for Synchrony—Angel Nayman—was deposed in this matter and provided contradictory deposition testimony. And even if Mr. Nayman's declaration is self-serving—which I'm not sure it is[5]—that fact alone is not a reason to discount it. "Indeed, 'a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment … even where … the information is self-serving." *Paladino v. Newsome*, 885 F.3d 203, 209 (3d Cir. 2018) (quotation omitted). Thus, SageStream has evidence that could permit a jury to conclude that the Exception Code was not misleading.

### C.    Reasonable Procedures To Assure Maximum Accuracy

The FCRA's "maximum possible accuracy" standard "mandates 'more than merely allowing for the possibility of accuracy.'" *Bibbs*, 43 F.4th at 342 (quotation omitted). Indeed, "maximum" denotes "[t]he highest or greatest amount, quality, value, or degree." Black's Law Dictionary, 1131 (4th ed. 1968). As such, "the distinction between 'accuracy' and 'maximum possible accuracy' is … quite dramatic." *Bibbs*, 43 F.4th at 342 (quotation omitted).

---

[5]    Mr. Breitenbach does not explain how a declaration from Synchrony can be "***self***-serving" for SageStream.

CRAs must employ reasonable procedures to meet that standard. "Reasonable procedures are those that a reasonably prudent person would undertake under the circumstances." *Cortez*, 617 F.3d at 709 (quotation omitted). In general, to determine whether a CRA's procedure was reasonable "involves weighing the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy." *Id.* (same). However, the Third Circuit has declined to endorse a specific standard for determining whether the plaintiff has sufficient evidence to establish that a CRA's procedures were unreasonable. Instead, there are three potential options: (1) "a plaintiff must produce some evidence beyond a mere inaccuracy in order to demonstrate the failure to follow reasonable procedures;" (2) "the jury may infer the failure to follow reasonable procedures from the mere fact of an inaccuracy;" or (3) "upon demonstrating an inaccuracy, the burden shifts to the defendant to prove that reasonable procedures were followed." *Id.* (same). Mr. Breitenbach can establish that SageStream failed to use reasonable procedures when it returned the Exception Code to Synchrony under any of these approaches.

Having determined that the Exception Code was materially misleading and, therefore, inaccurate, a jury could infer that SageStream failed to follow reasonable procedures based on that fact alone, satisfying the second test. In addition, Mr. Breitenbach could prevail under the first method because he has additional evidence beyond the inaccuracy itself. There is evidence in the record that SageStream had

information to know that the input SSN belonged to Mr. Fandl—not Mr. Breitenbach. Like the CRA in *Cortez*, the information in SageStream's possession revealed multiple discrepancies between Mr. Breitenbach's information and Mr. Fandl's—they had different names, different dates of birth, and lived in different places. But rather than share that information with Synchrony (as the CRA did in *Mijne*), SageStream ignored those inconsistencies and simply reported the Exception Code, creating the impression that the "consumer"—*i.e.* Mr. Breitenbach—was deceased or was attempting to perpetrate a fraud.

The potential harm from either inaccuracy is substantial, outweighing the minimal burden on SageStream to safeguard against such inaccuracies. SageStream had enough information in its possession to let Synchrony know that the input SSN belonged to someone other than Mr. Breitenbach. In other words, there was no need for SageStream to undertake an investigation or gather additional information to assure maximum accuracy regarding Mr. Breitenbach's credit application. Thus, SageStream's issuance of the Exception Code, by itself, was unreasonable. *See, e.g., Cortez*, 617 F.3d at 710; *Sheldon v. Experian Info. Solutions, Inc.*, No. 08-cv-5193, 2010 WL 3768362, at *3-4 (E.D. Pa. Sept. 28, 2010).

Mr. Breitenbach can prevail under the third test as well because a jury could conclude that SageStream cannot show that it followed reasonable procedures in this instance. In its briefing on this issue, SageStream erects a straw man. The question isn't whether it was reasonable for SageStream to "run the SSN information provided against

the Death Master File." (ECF No. 58-1 at 4.) Instead, the question is whether it was reasonable for SageStream to report (via the Exception Code) that the DMF listed Mr. Breitenbach as deceased when SageStream knew that Mr. Fandl was the one who appeared on that list. Certainly, a jury could determine that it was unreasonable for SageStream to provide this information to Synchrony, knowing that it was false.

In addition, SageStream's reliance on the *Grenier* and *Young* cases is misplaced. As an initial matter, neither district court decision is binding on me. Nor is the Seventh Circuit's decision in *Henson*, upon which both *Grenier* and *Young* relied to conclude that running a SSN through the DMF is a reasonable procedure as a matter of law. *See Young v. Experian Info. Sols., Inc.*, No. 22-cv-50222, --- F. Supp.3d ----, 2025 WL 964877, at *11 (N.D. Ill. Mar. 31, 2025) (citing *Henson v. CSC Credit Servs.*, 29 F.3d 280 (7th Cir. 1994)); *Grenier v. Trans Union LLC*, No. 22-cv-62302, 2024 WL 3103660, at *4 (S.D. Fla. May 13, 2024) (same). In *Henson*, the Seventh Circuit held that "as a matter of law, a credit reporting agency is not liable under the FCRA for reporting inaccurate information obtained from a court's Judgment Docket, absent prior notice from the consumer that the information may be inaccurate." *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 (7th Cir. 1994). Here, on the other hand, there *is* evidence that SageStream had notice that the information might be inaccurate—it knew that Mr. Fandl appeared on the DMF, not Mr. Breitenbach. Thus, I do not find *Henson*, *Grenier*, or *Young* persuasive.

Again, the question is not whether the SSA's DMF is a reliable source of information, such that it was reasonable for SageStream to rely on it. Instead, the question is whether it was reasonable for SageStream to provide that information by itself, if doing so was materially misleading. "Although it is certainly reasonable to presume the accuracy of official government records, such reliance by a CRA does not by itself guarantee that *its* records are accurate, because matching facially accurate data to the wrong consumer necessarily creates an inaccuracy." *Kulb v. ChexSystems, Inc.*, No. 24-cv-1390, 2025 WL 1071423, at *2 (E.D. Pa. Apr. 8, 2025). As a CRA, SageStream "remains responsible for the accuracy in its reports under the FCRA[,]" and its duty does not vary depending on the source(s) on which it relies. *Cortez*, 617 F.3d at 710. And, in any event, the U.S. National Technical Information Service, which provides access to the DMF, cautions subscribers that they "should not take any adverse action against any individual without further investigation to verify the death listed." (ECF No. 43-23 at 1.) Considering all this, a jury could determine that SageStream failed to use reasonable procedures to assure that it reported on Mr. Breitenbach with maximum accuracy.

### D.    Causation

There is no dispute that Synchrony denied Mr. Breitenbach's credit application after receiving the Exception Code from SageStream. And the denial of credit constitutes an injury for purposes of his claim. *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 968 (3d Cir. 1996) (abrogated on other grounds by *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47

(2007)). However, because there is a genuine dispute as to whether the Exception Code was inaccurate (and, if so, how), there is necessarily a question of fact as to whether an inaccuracy caused Mr. Breitenbach's injury.

**E.    Willfulness**

The "FCRA imposes civil liability where the defendant 'willfully fails to comply' with the statute." *Fuges v. Sw. Fin. Servs., Ltd.*, 707 F.3d 241, 248 (3d Cir. 2012) (quoting 15 U.S.C. § 1681n(a)). To prove a willful FCRA violation, a consumer must show that the CRA either knowingly or recklessly violated the act's requirements. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). A CRA does not act in reckless disregard of the FCRA "unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69. Accordingly, SageStream "cannot be said to have willfully violated FCRA if [it] acted on a reasonable interpretation of FCRA's coverage." *Fuges*, 707 F.3d at 248. Thus, even if I disagree with SageStream's reading of the statute, I cannot subject it to liability for a willful violation of the FCRA "unless [SageStream's] reading is 'objectively unreasonable.'" *Id.* at 249 (quotation omitted).

To determine whether SageStream's conduct was reckless, I must "examine the text of the statute, case law that existed at the time of the alleged violation, and any agency interpretations." *Seamans*, 744 F.3d at 868 (citation omitted). If SageStream's reading of

Section 1681e(b) "is reasonable in light of the text and other judicial and regulatory authority, then [it] has committed no willful violation as a matter of law." *Norman v. Trans Union, LLC*, 669 F. Supp. 3d 351, 386 (E.D. Pa. 2023). Mr. Breitenbach has sufficient evidence that could lead a jury to conclude that SageStream acted recklessly when it provided the Exception Code to Synchrony.

As to "consumer report," the term is broad on its face, consistent with the FCRA's remedial purposes. The Exception Code communicates information that bears on Mr. Breitenbach's credit worthiness, credit capacity, and personal characteristics, and Synchrony used that information to establish his eligibility for credit. Thus, the Exception Code fits squarely within the definition of a consumer report. *See* 15 U.S.C. § 1681a(d)(1)(A). It does not matter that the Exception Code was not a full-blown credit report because the statutory definition of a consumer report is not so limited.

Controlling case law also undermines SageStream's position. In *Cortez*, the Third Circuit concluded that an OFAC alert constituted a consumer report under the FCRA because—like a credit report—it constituted "**any** ... communication of **any** information by a consumer reporting agency." *Cortez*, 617 F.3d at 707 (emphasis added). While the OFAC alert at issue in *Cortez* was attached to a credit report, that fact was not dispositive. The *Cortez* decision demonstrates the clear flaw in SageStream's argument that the Exception Code "somehow manages to avoid the reach of the FCRA [because SageStream] ignores the breadth of the language that Congress used in drafting that statute." *Id.*

Both the statute and controlling case law also make clear that the FCRA demands "maximum" accuracy, which is much more than the possibility of accuracy or technical, yet misleading, accuracy. While the Third Circuit has not confronted a factual scenario that is on all fours with this case, *Cortez* stands for the general proposition that assuring maximum accuracy might require more than blind reliance on records from a third party— even when such information comes from presumably reliable government records. When there are multiple inconsistencies between a CRA's information about a consumer and information about that alleged consumer from a third party, *Cortez* prohibits a CRA from disregarding those inconsistencies: "Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a [CRA] to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party." *Cortez*, 617 F.3d at 710.

To the extent *Grenier* and *Young* hold that reliance on the SSA's DMF is reasonable as a matter of law, they don't matter for at least two reasons. *First*, both cases came **after** SageStream issued the Exception Code. Only "case law that existed at the time of the alleged violation" can impact a CRA's understanding of the reasonableness of its actions. *Seamans*, 744 F.3d at 868. *Second*, *Grenier* and *Young* are decisions by district court judges outside the Third Circuit. They don't control in this case, and a sophisticated business like SageStream must understand that the law differs from circuit to circuit.

Given the clear and unambiguous text of the statute and the relevant legal landscape that existed within the Third Circuit as of February 2023, there is a genuine question as to whether SageStream's alleged violation of the FCRA was willful.

## IV.    CONCLUSION

SageStream is not entitled to summary judgment because Mr. Breitenbach has enough evidence to prevail on each of his claims. While Mr. Breitenbach has enough evidence to prevail, there are genuine questions of fact as to each element of his FCRA claims. Thus, he is not entitled to summary judgment either, and this case must go to trial. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

June 11, 2025